UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| MICHAEL G. SMITH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:13-cv-02029-SEB-MJD |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER OVERRULING OBJECTIONS TO MAGISTRATE'S REPORT AND RECOMMENDATION

This is an action for judicial review of the final decision of Defendant Commissioner of

Social Security ("Commissioner") finding Plaintiff Michael Smith ("Smith") not entitled to

Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Title II

and Title XVI of the Social Security Act. *See* 42 U.S.C. §§ 416(i), 423(d), & 1382c(a)(3). This

cause is before the Court on Plaintiff's objections to the Magistrate Judge's Report and

Recommendation. For the reasons set forth below, we OVERRULE Plaintiff's objections and

ADOPT the Magistrate Judge's Report and Recommendation, affirming the decision of the

Commissioner.

### Factual and Procedural Background

### Facts[1]

Plaintiff Michael Smith was fifty-eight years old when he applied for disability and

Social Security benefits in February 2011. [R. at 53.] Smith alleged disability primarily due to a

---

[1] With some slight alterations, this factual narrative is taken from that presented by Magistrate
Judge Dinsmore in his Report and Recommendation.

head injury he suffered in 2009. [R. at 13, 19.] He also reported limitations due to back pain and headaches. [R. at 35, 44.] Smith's treating physician from 2005 through 2012 was Dr. Abdul Sankari. [R. at 374, 399, 733.]

In March 2007, Plaintiff fell out of his semi-truck and lost consciousness. [R. at 259.] He was hospitalized and diagnosed with "mild traumatic brain injury/concussion." [*Id.*] CT scans showed a small hematoma, but Plaintiff "remained alert" and had "no complaints." [*Id.*] A CT scan of Plaintiff's spine showed "mild" to "moderate" degenerative changes. [R. at 248-50.] The hospital discharged him in stable condition, [*id.*], and several weeks later, Dr. Sankari reported Plaintiff was "doing well." [R. at 389.] Plaintiff returned to work as a truck driver in 2007 and continued working in 2008. [R. at 19.]

On March 19, 2009, Plaintiff was again hospitalized, this time after striking his head on his truck trailer. [R. at 270.] A CT scan of his spine showed degenerative disc disease. [R. at 277-78.] A CT scan of his head showed a "small left frontal subdural hematoma" and "mild" left frontal cerebral softening. [*Id.*] He complained of nausea, vomiting, and headache, and the hospital physician expressed concern because the symptoms appeared more severe than suggested by the "unremarkable" CT scan. [R. at 272-73.] The physician recommended additional evaluation. A CT scan and ultrasound of Smith's neck showed a thyroid nodule, but the nodule was benign. [R. at 275, 279, 622.] By March 21, 2009, Plaintiff's symptoms subsided, and the hospital discharged him [R. 270.]

Later that month, Plaintiff twice saw Dr. Sankari. He complained of a "dull," sometimes "throbbing" head pain, [R. at 382], and "mild" left-side headaches. [R. at 379.] Overall, however, Plaintiff was "doing well," and Dr. Sankari approved his "return to work with no restraints" in

April 2009. [R. at 378.] Plaintiff returned to work that month. [R. at 376.] In August 2009, at his next appointment with Dr. Sankari, Plaintiff reported "poor short-term memory" as his only residual symptom. [R. at 376.] He did not mention headaches or back pain. [*Id.*] In January 2010, Plaintiff again complained of "poor memory," but Dr. Sankari wrote that Plaintiff's condition was "stable" and secondary to his history of head injuries. [R. at 374.] Again, Plaintiff did not complain of headaches or back pain. [*Id.*]

The next year, Plaintiff worked for White Construction as a carpenter from November 16 to December 3. [R. at 186.] The White Construction site manager reported "no problems" with Plaintiff's ability to complete tasks, follow instructions, work with others, or maintain attendance. [R. at 186-87.] Plaintiff worked 40 to 60 hours each week and could "concentrate on assigned" tasks for the normal work periods. [R. at 186.]

In 2011, Plaintiff began the disability benefits process. Employees at a field office visit stated Plaintiff "seemed confused and had trouble answering questions regarding medical information." [R. at 177.] Plaintiff then saw Dr. Luella Bangura for a medical consultative examination. [R. at 435.] She noted a "shuffling gait" and opined that Plaintiff could not stand or walk for at least two hours; bend over; squat; lift less than ten pounds frequently; or lift more than ten pounds occasionally. [R. at 438-39.] She indicated no limitations on Plaintiff's range of motion [R. at 440], but stated Plaintiff had limitations related to memory, sustained concentration, and social functioning. [R. at 439.]

Next, Plaintiff saw consultative examiner Dr. Patrick Brophy for a psychological consultation. [R. at 442.] Dr. Brophy reviewed medical records from Dr. Sankari and from Plaintiff's 2009 hospital stay. [*Id.*] He acknowledged that the CT scans showed tissue loss in

Smith's left frontal lobe. [R. at 445.] He noted Plaintiff's prior complaints of memory loss, and Plaintiff complained that "he was forgetting what to do at work." [*Id.*] Dr. Brophy then administered a Wechsler Memory Scale test and wrote that Smith's results showed "cognitive change." [R. at 444-45.] His overall "diagnostic impression" was "cognitive disorder" due to a "closed head injury." [R. at 445.] Nonetheless, Smith "acted as his own primary informant," [R. at 443], and Dr. Brophy observed that Smith was "very precise about dates and details." [*Id.*] Smith also stated he had never sought psychiatric treatment. [*Id.*]

One week later, state agency doctor J. Gange reviewed Smith's records and concluded he did not have a "severe" mental impairment. [R. at 449.] Dr. Gange considered the results of Dr. Brophy's examination; a report from Smith's girlfriend; a report from White Construction; and Smith's own allegations. [R. at 461.] Relying largely on the White Construction report, he found that Smith "appears to function at a higher level than he alleges." [*Id.*] Dr. Gange completed a Psychiatric Review Technique Form and found Smith had no mental limitations on daily living; no mental limitations on social functioning; no episodes of decompensation; and "mild" difficulties in maintaining concentration, persistence, or pace. [R. at 459.]

Later that month, state agency medical expert Dr. J. Sands reviewed Plaintiff's records and determined Smith did not have a "severe" physical impairment. [R. at 463.] He found Smith's "neurological allegations" were "unsupported" by the record. [*Id.*] State agency reviewing consultant J.V. Corocan affirmed Dr. Sands' assessment. [R. at 465.] State agency psychological consultant Joelle Larsen likewise affirmed Dr. Gange's assessment. [R. at 464.]

Plaintiff returned to Dr. Sankari for an annual exam in October, 2011, almost two years after his last visit. [R. at 467.] He told Dr. Sankari he was applying for disability benefits and complained of "worsening low back pain." [*Id.*] Smith also described numbness in his lower left

extremity, [*id.*], and Dr. Sankari observed a "[p]ossible mild left foot droop with walking." [R. at 468.] Dr. Sankari noted that Smith had a history of "poor memory" related to his head injury, but Smith did not complain of headaches or changes in his memory. [R. at 467.] At various times, Dr. Sankari also noted a history of hypertension and hyperlipidemia, [R. at 467, 751], but Plaintiff did not report related symptoms. [*Id.*]

In November, 2011, Plaintiff fell approximately 17 feet from a ladder while helping a friend install roof trusses. [R. at 45-46, 485.] He broke his right ankle and left knee and was hospitalized. [R. at 536.] Orthopedic surgeon Michael Highhouse repaired the fractures. [*Id.*] While hospitalized, Smith underwent a CT scan on his upper spine, lumbar spine, and head. The upper spine CT scan showed disc space narrowing; mild degenerative changes at the C5-C6 and C6-C7 interspace levels; and "mild to moderate degenerative change" in the C2-C3, C3-C4 and C4-C5 levels. [R. at 617, 809.] It showed no fractures or dislocations. [*Id.*] The lumbar spine CT showed degenerative cysts and degenerative disc disease, but no significant disc bulge, herniation, or stenosis. [R. at 620, 808.] The head CT scan showed that the previously observed tissue loss in Smith's left frontal lobe remained unchanged. [R. at 619, 810.]

After being discharged, Smith had follow-up appointments with Dr. Highhouse, who stated Smith was "coming along well" and had "no acute problems." [R. at 471.] In December 2011, Smith told Dr. Highhouse that he wanted to return to work as a supervisor, and Dr. Highhouse wrote that it would be "reasonable" to do so. [*Id.*] Highhouse opined that Smith should avoid uneven surfaces and heights, but could otherwise "stand as a supervisor." [*Id.*] Further, Dr. Hightower stated Smith would be able to return to activities as tolerated within three to four months. [*Id.*] Smith also underwent physical therapy with Dr. Mark Griffith, who

reported that Smith made good progress, [R. at 503, 512], and had good range of motion. [R. at 783.]

By February of 2012, Smith's fractures were "well-healed" and X-rays showed no evidence of complications. [R. at 472.] Smith reported "intermittent pain," but received medication to manage it. [*Id.*] Dr. Highhouse released Smith and referred him to his primary care physician for any lingering symptoms. [*Id.*]

Plaintiff continued to visit Dr. Sankari in late 2011 and in 2012. In November 2011 [R. at 790], January 2012 [R. at 772], and July 2012 [R. at 745], Smith denied suffering from any headaches. At each appointment, Dr. Sankari noted "short-term memory loss" in Smith's medical history, but did not include back pain or similar conditions. [R. at 744, 772, 789.] Dr. Sankari also found Smith had no acute focal motor or sensory deficits. [R. at 752, 773, 790.]

In May 2012, Dr. Sankari completed a form for the Indiana Carpenters Pension Fund, in which he stated Smith was totally and permanently disabled due to a history of "subdural hematoma and long term problems with short and long term memory." [R. at 814.] Dr. Sankari indicated Smith had been disabled since March 2007. [*Id.*] In July 2012, Dr. Sankari completed a Medical Source Statement ("MSS") describing Smith's ability to do work-related activities. [R. at 734.] He indicated Smith could sit or stand for two hours at a time; walk for an hour at a time; occasionally stoop or climb; and perform daily activities; but could not kneel or crouch; lift more than twenty pounds; or carry more than ten pounds. [R. at 734-39.] The form asked Dr. Sankari to "identify particular medical or clinical findings" supporting his assessment, but Sankari did not elaborate on his opinion. [R. at 734-39.]

Smith testified before Administrative Law Judge William Sampson in August 2012. He described his fall from the ladder in 2011 and stated that his ankle and knee still experienced

pain and swelling. [R. at 34.] He said he could walk up to 400 yards before resting and could not

stand for very long because of his back pain. [R. at 35.] His pain was a "four" on a scale of one

to ten, but medication eased the pain. [R. at 36-37.] He complained of "real bad headaches," and

said he would not be able to perform work of the sort he did for White Construction because he

could not lift or carry supplies. [R. at 44.] He reported no problems performing tasks such as

cooking, laundry, or daily grooming. [R. 42-43.] The ALJ also received a report from Smith's

girlfriend, who stated that Smith had a very poor memory and could not do any chores because

of his back pain. [R. at 218.]

**Procedural History**

Smith filed applications for Disability Insurance Benefits (DIB) and Supplemental

Security Income (SSI) on February 23, 2011, alleging a disability onset date of March 15, 2009.

The Social Security Administration denied his claim initially on April 25, 2011, and again upon

reconsideration on June 23, 2011. Smith then requested a hearing, which Administrative Law

Judge (ALJ) William E. Sampson conducted in Valparaiso, Indiana on August 6, 2012.

The ALJ found on August 24, 2012 that Smith was not entitled to benefits. *See* Docket

No. 13-2 at 13–23. The ALJ's decision applied the five-step Social Security analysis, and began

by finding at Step 1 that Smith met the insured status requirements of the Act through December

31, 2014, and that Smith had not engaged in substantial gainful activity since his alleged onset

date. *Id.* at 15. At Step 2, the ALJ found that Smith had the following medically determinable

impairments: history of closed head injury, status post left knee and right ankle surgery,

hypertension, hyperlipidemia, status benign thyroid nodule aspiration, cognitive disorder, and

lumbar and cervical spine degenerative changes. *Id.* at 16. However, the ALJ found that none of

these impairments, singly or in combination, were "severe." He thus ended the analysis at Step 2,

finding Smith not disabled. *Id.* at 16–23 (citing 20 C.F.R. § 404.1521; 20 C.F.R. § 416.921 *et seq.*).

Smith then appealed to this Court, and Magistrate Judge Dinsmore issued a Report and Recommendation on September 26, 2014, rejecting Smith's arguments and recommending that the Court affirm the Commissioner's decision that he is not entitled to DIB and SSI benefits. *See* Docket No. 21. Smith filed timely objections to the Report and Recommendation on October 10, 2014. Docket No. 22.

## Legal Analysis

### Standard of Review

We review the Commissioner's denial of benefits to determine whether it was supported by substantial evidence or is the result of an error of law. *Rice v. Barnhart,* 384 F.3d 363, 368–369 (7th Cir. 2004); *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir. 2001). In our review of the ALJ's decision, we will not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute [our] own judgment for that of the Commissioner." *Lopez,* 336 F.3d at 539. However, the ALJ's decision must be based upon consideration of "all the relevant evidence," without ignoring probative factors. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). In other words, the ALJ must "build an accurate and logical bridge" from the evidence in the record to his or her final conclusion. *Dixon*, 270 F.3d at 1176. We confine the scope of our review to the rationale offered by the ALJ. *See SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Tumminaro v. Astrue,* 671 F.3d 629, 632 (7th Cir. 2011).

When a party raises specific objections to elements of a magistrate judge's report and recommendation, the district court reviews those elements *de novo,* determining for itself whether the Commissioner's decision as to those issues is supported by substantial evidence or was the result of an error of law. Fed. R. Civ. Pro. 72(b). The district court "makes the ultimate decision to adopt, reject, or modify" the report and recommendation, and it need not accept any portion as binding; the court may, however, defer to those conclusions of the report and recommendation to which timely objections have not been raised by a party. *See Schur v. L.A. Weight Loss Ctrs., Inc.*, 577 F.3d 752, 759–761 (7th Cir. 2009).

## Discussion

Smith objects to the Magistrate Judge's affirmation of the ALJ's decision at Step 2 that none of his impairments qualified as "severe." Specifically, he contends that the Magistrate erred in accepting the ALJ's conclusions with respect to the credibility of Smith's testimony on the limiting effects of his pain and the weight to be accorded the opinions of consultative examiners ("CEs") Dr. Bangura and Dr. Brophy and treating physician Dr. Sankari.

## I. Legal Standard for Step 2 Analysis

As the Magistrate Judge observed, the ALJ is to consider an impairment or combination of impairments to be "severe" when they "significantly limit [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a). Regulations implementing the Act state that such basic activities include walking, standing, sitting, pushing, and handling; understanding, carrying out, and remembering instructions; and responding appropriately to supervision and co-workers. *Id.* at § 404.1521(b).

Social Security Ruling 85-28 clarifies that the ALJ should find an impairment or impairments "not severe" only if they constitute a "slight abnormality or a combination of slight

abnormalities"; "great care" should be exercised before declaring that a claimant does not satisfy the Step 2 criteria, including a "careful evaluation of the medical findings which describe the impairment(s) and an informed judgment about [their] limiting effects." S.S.R. 85-28.[2] A claimant bears the burden of establishing a severe impairment, *see Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992), but Plaintiff correctly notes that the threshold showing required at Step 2 is not a demanding one. They quote a 1990 Seventh Circuit decision, in fact, that characterizes Step 2 as a "*de minimis* screening device." *Johnson v. Sullivan,* 922 F.2d 346, 347 (7th Cir. 1990) (rejecting agency regulations prohibiting the consideration of impairments in combination). *De minimis* or not, the mandate to the ALJ is clear: the claimant's burden cannot be satisfied "when medical evidence shows that the [claimant] has the ability to perform basic work activities." S.S.R. 85-28. We now examine whether the ALJ's decision that Smith failed to carry this burden was reasonable and supported by substantial evidence.

## II.     Plaintiff's Objections

## A. Test Results and the ALJ's assessment of Smith's credibility

Smith first appeals the ALJ's decision on the grounds that objective medical tests establish the existence of significant spinal impairments, and that the ALJ should therefore have credited Smith's own testimony that these impairments limited his functioning. The Magistrate rejected this argument, observing that "Plaintiff in this case has failed to connect the test results he cites to *functional* limitations on Plaintiff's *activities.*" R & R 11 (emphasis original). Because the CT scan results cited by Smith did not necessarily establish functional deficiencies and the ALJ's was reasonable in finding Smith's testimony regarding his walking and standing ability

---

[2] Accessed at http://www.ssa.gov/OP_Home/rulings/di/01/SSR85-28-di-01.html.

not to be credible, the Magistrate concluded that Smith's invocation of his medical test results was unavailing. *Id.* at 11–12.

The ALJ considered evidence from several medical imaging tests showing that Smith had been "diagnosed with lumbar and cervical spine degenerative changes." Docket No. 13-2, R. 20). After his head injury in March 2007, Smith underwent a cervical spine x-ray that showed "moderate degenerative change" to his C5-6 and C6-7 vertebrae. *Id.* After he struck his head on a tractor trailer in March 2009, a CT scan showed "moderate bilateral neural foraminal stenosis in his C5-C7 vertebrae. R. 19 (citing Ex. 2F, R. 277–278). Another CT scan was performed in 2011 after Smith fell off a ladder; this showed "disc space narrowing with mild hypertrophic end plate degenerative changes, mild diffuse bilateral facet degenerative changes, and mid neural foarmen stenosis at C4-5." R. 21 (citing Ex. 16F). As the Magistrate notes, however, "[s]everity thus turns on the claimant's functional limitations, not abstract test results or diagnoses." R & R at 11 (citing *Skinner v. Astrue,* 478 F.3d 836, 845 (7th Cir. 2007)). The ALJ determined that these records did not establish "severe" lumbar/cervical spinal impairment, reasoning that "[t]he record does not contain any treatment related to these impairments. There is no evaluation by a specialist, there is no recommendation for surgery, and there is no mention of possible paralysis." R. 21.

Plaintiff argues that these imaging results are no "record of his complaints"; rather, they point to the existence of a "medically determined impairment that could reasonably be expected to produce" the symptoms described by Smith in his testimony. Pl.'s Obj. at 2 (citing *Indoranto v. Barnhart,* 374 F.3d 470, 474 (7th Cir. 2004)). Thus, Plaintiff contends, the ALJ erred in discounting Smith's testimony that he suffered from back pain, that he could walk only 400 yards at a time, and that he could "not stand very long." R. 35; Pl.'s Obj. at 3 ("[O]nce the

claimant produces medical evidence of an underlying impairment . . . the Commissioner may not discredit the claimant's testimony as to subjective symptoms merely because they are unsupported by objective evidence.") (quoting *Carradine v. Barnhart,* 360 F.3d 751, 753 (7th Cir. 2004)).

We agree with the Magistrate that the ALJ's analysis was supported by substantial evidence. As he pointed out elsewhere in his opinion, Smith was able to work as a truck driver in 2007 and 2008, and he worked 40 to 60 hours a week for White Construction near the end of 2010. R. 19, 21. *See Kasarsky v. Barnhart,* 335 F.3d 539, 544 (7th Cir. 2003) (noting that no severe impairment existed where the claimant "had been able to work despite [his] problems"). Although the 2011 CT scan post-dated Smith's last period of employment, the ALJ noted correctly that the medical records are devoid of any indication that Smith ever received treatment for the cervical impairments the scan revealed—or, indeed, that he ever complained of any pain or functional limitations. The ALJ observed that "[a]t the claimant's most recent visit with Dr. Sankari on July 31, 2012, the claimant's cervical and lumbar spine conditions are not even listed in the problem list or diagnosis summary . . . . Dr. Sankari observed that the claimant was well appearing and in no distress." R. 21 (citing Ex. 18F).

Smith misconstrues the applicable law in arguing that the ALJ was required to credit his testimony on pain and functional limitations so long as the record showed the existence of cervical impairments that *could* be consistent with such effects. The Seventh Circuit decision Smith quotes, *Carradine v. Barnhart,* 360 F.3d 751 (7th Cir. 2004), is instructive. The Court there grappled with one of the chief dilemmas facing ALJs and reviewing judges in Social Security cases: a claimant's subjective pain can be disabling in its own right, and should not be discounted simply because it is not confirmed by other evidence; at the same time, however, the

Commissioner cannot award benefits to anyone who baldly claims to be in severe pain. In the court's words:

> Medical science confirms that pain can be severe and disabling even in the absence of "objective" medical findings, that is, test results that demonstrate a physical condition that normally causes pain of the severity claimed by the applicant. . . . And so "once the claimant produces medical evidence of an underlying impairment, the Commissioner may not discredit the claimant's testimony as to subjective symptoms merely because they are unsupported by objective evidence." *Lester v. Chater,* 81 F.3d 821, 834 (9th Cir. 1996). A claimant's subjective testimony supported by medical evidence that satisfies the pain standard is itself sufficient to support a finding of disability. . . . But of course this dispensation invites the unscrupulous applicant to exaggerate his or her pain without fear of being contradicted by medical evidence.

360 F.3d at 753 (additional citations omitted). And so, the court reasoned, the ALJ must "evaluate the applicant's credibility with great care." Social Security Ruling 96-7p provides that in weighing the credibility of a claimant's statements, ALJs should take into account "the entire case record, including the objective medical evidence . . . statements and other information provided by treating or examining physicians . . . and any other relevant evidence in the case record." S.S.R. 96-7p.

We "will not disturb an ALJ's credibility findings unless they are patently wrong." *Sims v. Barnhart,* 309 F.3d 424, 431 (7th Cir. 2002). Here, the ALJ concluded that, while medical imaging showed "mild" or "moderate" spinal abnormalities, Smith's testimony on the disabling effect of his back symptoms was not credible in light of his contemporaneous work activities and his medical treatment records. We therefore do not overturn the ALJ's conclusion that Smith's "spine impairments do not have more than a minimal effect [on his] ability to perform basic work activities, and therefore, are 'non-severe.'" R. 21.

**B. Dr. Bangura's report**

The ALJ considered CE Dr. Luella Bangura's April 2011 report. R. 21. In her report, Dr. Bangura opined that Smith was able to sit for at least 2 hours and handle objects for at least 2 hours, but was unable to stand or walk for at least 2 hours or carry or lift 10 pounds more than occasionally. Ex. 7F (R. 438–439). She further opined that he had "limitations" in memory and understanding, sustained concentration, and social interaction. R. 439. The ALJ assigned this opinion "no weight," reasoning as follows:

> Dr. Bangura examined the claimant once and her observations and conclusions are not supported by the record. Dr. Bangura identified no restrictions in range of motion, but then noted significant postural limitations. Her opinions are also not supported by the claimant's reported activity level (climbing ladders 17 feet high). Finally, her conclusion as to the claimant's mental limitations is based upon matters outside her area of expertise.

R. 21.

We agree with the Magistrate that the ALJ adequately explained his decision to accord the Bangura report no weight. Regulations prescribe that an ALJ consider six factors in assessing the weight to be given a medical source statement (MSS): the length of the treatment relationship and frequency of examination; the nature and the extent of the relationship between doctor and patient; the supportability of the opinion; its consistency with the rest of the record; and the specialization of the doctor. 20 C.F.R. § 404.1527(c). Here, the ALJ took note of the fact that Bangura examined Smith only once. R. 21 He further observed that Dr. Bangura's opinion was less supportable because it was internally inconsistent: her physical examination noted no restrictions in his range of motion, but asserted at the same time that he had significant postural limitations, including inability to walk on heels, walk on toes, bend over, or squat. R. 436, 438. *See Freels v. Astrue,* 772 F. Supp. 2d 608 (D. Del. 2011). The ALJ also found that Dr. Bangura's opinion was inconsistent with the rest of the record. As the Magistrate noted, Dr. Sankari concluded that Smith *was* able to stand for at least two hours, and Dr. Bangura's conclusions

regarding his postural limitations and his inability to lift or carry weight is undermined by the fact that, later the same year, Smith was climbing ladders and helping his friend install roof trusses. R. 21; R & R at 13.[3] Finally, the ALJ properly considered Dr. Bangura's specialization; he noted that, as a medical doctor performing a physical examination, she was not competent to opine on his functional cognitive limitations. R. 21; R & R 14 (citing *Rodenberg v. Colvin,* 2014 WL 4230924, at *16 (W.D. Wis. Aug. 26, 2014)).

Plaintiff objects that it was unreasonable to give the opinion of Dr. Bangura—who examined Smith one time—less weight than that of the state agency reviewers who did not examine him it at all. Pl.'s Obj. at 3 (citing 20 C.F.R. §§ 404.1527(c)(1), 404.1427(c)(3)). It is inappropriate, however, to assign error to the ALJ merely because one criterion in a multi-factor test—if taken in isolation—would support granting Dr. Bangura's opinion greater weight. As we have noted, the ALJ considered several other factors as well, including the opinion's internal consistency, Dr. Bangura's specialization, and its consistency with the rest of the record as a whole. As to this last factor, the ALJ was not unreasonable to judge Dr. Bangura's opinion to be an outlier. While it may be (partially) consistent with the report provided by Dr. Sankari, it is inconsistent with the treatment notes of his orthopedic surgeon Dr. Highhouse and his physical therapist Dr. Griffith, both of whom treated Smith in late 2011 and early 2012, R. 20 (citing Exs. 14F, 18F); it is also inconsistent with Smith's own range of physical activities. The ALJ did not discount Dr. Bangura's opinion *because* it was inconsistent with those offered by the agency reviewing physicians. Rather, he discounted it because—in addition to the other reasons he

---

[3] The ALJ specifically made reference to the fact that Smith was climbing ladders 17 feet high as a counterweight to Dr. Bangura's opinion. He did not offer any detail in stating that Bangura's opinion was "not supported by the record," but his analysis of Dr. Sankari's partially inconsistent findings occurs in the next paragraph of his decision. R. 21.

listed—it was inconsistent with the larger record of which the state agency reviewing physicians'
reports are only a part. Plaintiff's objection to the Magistrate's conclusion in this respect is
without merit.

## C. The opinion of treating physician Dr. Sankari

The ALJ also considered the opinion of Smith's treating physician, Dr. Abdul Sankari.
"A treating doctor's opinion receives controlling weight if it is 'well-supported' and 'not
inconsistent with the other substantial evidence' in the record." *Scott v. Astrue,* 647 F.3d 734,
740 (7th Cir. 2011) (quoting 20 C.F.R. § 404.1527(c)(2)); *see also Punzio v. Astrue,* 630 F.3d
704, 710 (7th Cir. 2011). If an ALJ discounts the opinion of a treating physician, she must offer
"good reasons" for doing so, *Martinez v. Astrue,* 630 F.3d 693, 698 (7th Cir. 2011). On the other
hand, if "the treating physician's opinion is inconsistent with the consulting physician's opinion,
internally inconsistent, or based solely on the patient's subjective complaints, the ALJ may
discount it." *Ketelboeter v. Astrue,* 550 F.3d 620, 625 (7th Cir. 2008).

The ALJ discounted Dr. Sankari's opinions primarily because they were inconsistent.
The ALJ contrasted the opinions offered by Dr. Sankari on three occasions—April 2009, May
2012, and July 2012—as follows:

> In April 2009, Dr. Sankari opined that the claimant could return to work with no
> restrictions (Exhibit 5F, page 6). In direct conflict, in May 2012, Dr. Sankari
> opined that the claimant is permanently and totally disabled (unable to be
> gainfully employed) *since on or about March 2007* (Exhibit 18F, page 82).
> Finally, on July 31, 2012, Dr. Sankari opined the claimant can lift and carry 20
> pounds occasionally, 10 pounds frequently, sit 2 hours at one time for a total of 4
> hours, stand 2 hours at one time for a total of 2 hours, and walk 1 hour at a time
> for a total of 1 hour (Exhibit 18F). He further opined that the claimant can
> occasionally reach, climb, balance, and stoop; can frequently handle, finger, and
> feel; can continuously use his right foot and occasionally use his left foot; but
> should never kneel, crouch, or crawl (Exhibit 18F).

R. 21–22 (emphasis added). In addition to the marked contradiction between an April 2009 finding that Smith could work with no restrictions and a May 2012 opinion that Smith had been disabled *since March 2007*, the ALJ noted that Dr. Sankari's opinions were not supported by his treatment notes and reflected "infrequent visits and minimal treatment." *Id.* The ALJ opted to accord "little weight" to Dr. Sankari's view. *Id.*

Plaintiff correctly objects that the Magistrate's Report and Recommendation partially justified the ALJ's decision on grounds the ALJ himself did not utilize. Since the ALJ did not discuss Dr. Sankari's mislabeling of Smith's long-term and short-term memory loss or Dr. Sankari's failure to explain his finding regarding Smith's ability to walk, sit, or stand seven hours in a workday, we do not review the ALJ's decision on those bases. *See Haynes v. Barnhart,* 416 F.3d 621, 626 (7th Cir. 2005). Even setting aside these explanations, however, we find that the ALJ articulated sufficient reasons for discounting Dr. Sankari's opinion. He placed great weight on the irreconcilable inconsistency of Dr. Sankari's opinions over time, and he further noted the inconsistency between Dr. Sankari's assertions that Smith could work (or stand) one hour at a time and that he could only walk (or stand) for one hour a day *total.* R. 22.[4] The ALJ also noted that Dr. Sankari filled out the MSS form in minimalist fashion, offering no clinical findings to undergird his opinions. *Id.*; *see Ketelboeter,* 550 F.3d at 625 (holding that an ALJ was justified in discounting treating physician opinion where it was scantly supported by the record and internally inconsistent). As prescribed by SSA implementing regulations, he also took

---

[4] Plaintiff asserts that the ALJ should have re-contacted Dr. Sankari to resolve the "hour of work discrepancy." We agree with Defendant that "[a]n ALJ need recontact medical sources only when the evidence received is inadequate to determine whether the claimant is disabled." Def.'s Resp. 5 (quoting *Skarbeck v. Barnhart,* 390 F.3d 500, 504 (7th Cir. 2004)). The fact that Dr. Sankari's opinion contains inconsistencies does not mean that the record in front of the ALJ was inadequate to determine whether Smith was disabled; the ALJ opted to discount Dr. Sankari's opinion in favor of several other sources.

into account that the treatment notes reflect "infrequent visits and minimal treatment." R. 22. *See* 20 C.F.R. § 404.1527(c)(2)(i) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion.").

Social Security Ruling 96-2p explains that, even when deciding not to grant controlling weight to a treating physician's opinion, the ALJ should apply the factors set forth in 20 C.F.R. § 404.1527 to determine what weight the opinion should be given. SSR 96-2p. The ALJ here did not explicitly engage in such a bifurcated analysis; rather, he stated that he gave Dr. Sankari's opinion "little weight" for the reasons he had described. R. 22. *Cf. Larson v. Astrue,* 615 F.3d 744, 751 (7th Cir. 2010). Although the ALJ's decision here was not a model of thoroughness, however, he did explain himself. The ALJ did not recite that he was applying the six-part test under 20 C.F.R. § 404.1527, but he relied on three of its factors—treatment relationship, supportability, and consistency—in reaching his decision. R. 21–22. *See also* 20 C.F.R. §§ 404.1527(c)(2) (treatment relationship), 404.1527(c)(3) (supportability), 404.1527(c)(4) (consistency). Thus, we conclude that he has at least "minimally articulated" his reasoning, and his decision need not be overturned for lack of evidentiary support. *See Elder v. Astrue,* 529 F.3d 408, 415–416 (7th Cir. 2008) (holding that an ALJ's explanation for not according "substantial weight" to a physician's testimony were sufficient where he had at least "minimally articulated" his reasons); *Henke v. Astrue,* 498 F. App'x 636, 640 n.3 (7th Cir. 2012) (noting that an ALJ had done "enough" to explain his decision not to give the opinion of a treating physician added weight by noting the lack of supporting medical evidence and its inconsistency with the rest of the record). *Cf. Ledbetter v. Colvin,* 2014 WL 4965232, at *4 (S.D. Ind. Sept. 29, 2014) (finding

that ALJ erred in offering only a conclusory one-sentence explanation for according "little weight" to a treating physician's opinion).

Though the Magistrate has pointed to additional reasons for a fact-finder to be skeptical of the treating physician opinion of Dr. Sankari, the explanation offered by the ALJ himself is minimally sufficient. We therefore reject Plaintiff's objections in this respect.

**D. Opinion of Dr. Brophy**

Finally, Plaintiff objects to the portion of the Report and Recommendation upholding the ALJ's determination that CE Patrick Brophy's report did not establish a "severe" impairment due to closed head injuries.

Dr. Brophy performed a medical status examination on Smith in April 2011. Dr. Brophy noted that Smith "acted as his own informant," and had good command of dates and other details; according to Dr. Brophy, Smith also reported that he was capable of independence in activities of daily living. Ex. 8F, R. 442–443. Dr. Brophy administered the Wechsler Memory Scale IV test to Smith. In summarizing the results, Dr. Brophy noted that most of Smith's scores were between 7 and 8 (on a 1–10 scale), but that Smith scored poorly on the "Logical Memory II" portion," and had "considerable difficult[y] encoding lexical information presented auditorially." R. 444. Dr. Brophy's ultimately concluded that Smith was "showing cognitive change" that related to a 2007 CT scan showing bi-lateral frontal atrophy and a 2009 MRI showing tissue loss in the inferior aspect of the left frontal lobe. He did not offer further specific opinions regarding Smith's functional capacity.[5] The ALJ summarized Dr. Brophy's findings,

---

[5] He did offer that Smith was "apparently . . . no longer capable of passing the test that is required of truck drivers." R. 445. We agree with Defendant that the use of "apparently" likely signals that Dr. Brophy was simply relating what Smith had told him about being unable to pass the test.

and found them consistent with his own impression of Smith's cognitive ability based on the acuity Smith displayed in his hearing testimony—and consistent with the ALJ's determination that Smith did not display severe cognitive impairments under the four-part "paragraph B" functionality test for evaluating such impairments. R. 18–20. *See also* 20 C.F.R., Part 404, Subpart P, Appx. 1.

Plaintiff contends that the examination performed by Dr. Brophy, coupled with his diagnostic impressions, establishes a severe cognitive impairment enabling him to satisfy Step 2 of the Social Security Analysis. Specifically, he points to Smith's low diagnostic test result for memory and Dr. Brophy's diagnosis of an Axis I "cognitive disorder due to closed head injury."[6] He also notes that other portions of Smith's medical record support the conclusion that he has suffered from headaches and memory problems. Pl.'s Obj. at 5 (citing R. 374–379, 467–469, R. 743–749, 770–782, 814 (Sankari treatment notes); R. 435–440 (Bangura CE report)).

Plaintiff's objection is groundless because he never explains how the presence of closed-head injuries and cognitive impairments—both of which the ALJ acknowledged in his decision—establishes the existence of a "severe" impairment that impacts Smith's ability to perform work activities. *See Skinner v. Astrue,* 478 F.3d 836, 845 (7th Cir. 2007) ("[T]he existence of these diagnoses and symptoms does not mean the ALJ was required to find that Skinner suffered disabling impairments."). Plaintiff asserts that the ALJ selectively reviewed or "cherry-picked" the Brophy report, Docket No. 18 at 13, yet he offers no support for his

---

[6] Axis I disorders, as Plaintiff notes, are generally acute diagnoses requiring care. Pl.'s Obj. at 6 n.1 (citing http://faculty.fortlewis.edu/burke_b/Abnormal/Abnormalnultiaxial.htm (last visited Oct. 10, 2014)). While the website cited by Plaintiff appears to be inactive, Plaintiff's characterization is correct.

contention that the ALJ ignored any evidence that would have mandated a finding of a severe impairment. *Cf. Goble v. Astrue,* 385 Fed. App'x 588, 593 (7th Cir. 2010).

Here, the ALJ analyzed Smith's cognitive impairments in accordance with the four "Paragraph B" criteria set forth by the Listing of Impairments. He found no limitations in activities of daily living or social functioning and no evidence of episodes of decompensation; he found "mild" limitations with respect to concentration, persistence, or pace. R. 18 (citing Ex. 4E). In support of this finding, he cited Smith's own testimony that "he doesn't finish what he starts, can follow spoken instructions but not written instructions, and does not handle changes in routine well; however, . . . he drives, shops, can pay bills, and watches television." *Id.* Dr. Brophy's test results and diagnostic opinion certainly lend weight to the conclusion that Smith suffers memory deficits; it is not our province, however, to "play doctor" and determine that such a diagnosis necessarily entails severe functional limitations. *See Skinner,* 478 F.3d at 845. The ALJ considered Brophy's opinion consistent with a mild functionality limitation as to only one Paragraph B criterion, and therefore inconsistent with a finding of severe cognitive impairment. R. 18 (citing 20 C.F.R. 404.1520a(d)(1)). That conclusion finds support in Smith's own testimony (Ex. 4E) and is not clearly contradicted by any of Brophy's test results or diagnoses; in the absence of any other evidence in the record indicating that the ALJ's decision was irrational or unsupported by the evidence, we do not overturn it. *See Elder,* 529 F.3d at 413.

## Conclusion

For the reasons set forth above, the Commissioner's objections to the Magistrate's Report and Recommendation are OVERRULED, and the Commissioner's final decision denying Plaintiff's application for Disability Insurance Benefits and Supplemental Security Income is AFFIRMED. Final judgment in favor of Defendant and against Plaintiff will enter accordingly.

IT IS SO ORDERED.

Date: _____03/30/2015_____.

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana


Distribution:

Meredith E. Marcus
DALEY DISABILITY LAW, PC
mmarcus@fdaleylaw.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov